## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER,

           Plaintiff,

    v.

MID-AMERICA APARTMENT
COMMUNITIES, INC.

and

MID-AMERICA APARTMENTS, L.P.,

           Defendants.

**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

**Case No. 17-CV-02659-TNM**

1.     Mid-America Apartment Communities, Inc. and Mid-America Apartments, L.P. (collectively, "Defendants" or "MAA") maintained and enforced a criminal screening policy in at least 55 apartment complexes containing over 20,000 apartments across the country that categorically barred an untold number of individuals with criminal records from living at their properties.  Plaintiff Equal Rights Center ("ERC") brings this suit against MAA pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq*., to (1) prevent Defendants from continuing or renewing their discriminatory and unlawful conduct at the affected properties and ensure that applicants affected by the policy—who are disproportionately African American and Latino—will have a meaningful opportunity to secure sorely needed rental housing; and (2) redress the harm ERC has suffered as a direct result of Defendants' conduct.

2.     The policy's disproportionate adverse impact on African Americans and Latinos violates the federal Fair Housing Act and local ordinances, as set forth below, while additionally

flying in the face of instructions issued by the United States Department of Housing and Urban Development, which expressly condemn such across-the-board bans.  A less discriminatory alternative for dealing with any potential concerns raised by applicants with criminal records has always been available to Defendants.  Instead of automatically excluding every applicant covered by their far-reaching criminal screening policy, Defendants should have assessed potential residents with a criminal history individually by considering factors directly relevant to the prospective tenant's qualifications.  Through an individualized assessment of each applicant, Defendants would have maintained the ability to review carefully the qualifications of applicants to the apartment buildings at issue here while permitting prospective tenants who have felony convictions or other criminal histories, but pose no realistic threat to the community or the property, to obtain housing.

## NATURE OF THE ACTION

3.     Plaintiff Equal Rights Center seeks injunctive, monetary, and declarative relief against Defendants for engaging in a practice of illegal discrimination on the basis of race and national origin in properties that Defendants own and operate.

4.     From November 2016, or earlier, through at least January 2017, Defendants stated on their website and online application that they automatically exclude any person from renting an apartment in the 55 affected apartment complexes ("The Properties") who has a conviction for any felony (the "Felony Ban") or a pending felony charge (together, the "Felony Policy"). Defendants also stated on their website and online application that they maintain and enforce a closely related policy of automatically excluding any person from renting an apartment who has one of a number of undisclosed misdemeanor convictions or a pending charge for a misdemeanor on that undisclosed list (the "Misdemeanor Policy").  Both the Felony Policy and the

Misdemeanor Policy (together, the "Criminal Records Policy") were absolute and did not permit exceptions.  An applicant who has a criminal history within the scope of the Criminal Records Policy was automatically barred regardless of the nature of the conviction, the amount of time that has lapsed since the conviction, evidence of rehabilitation, or any other factor related to whether the person poses any threat to safety or property.  What is more, individuals with felony convictions were screened out before any of their other qualifications were considered; a felony conviction, no matter how long in the past or what the felony, was an automatic bar to completing their applications for housing at The Properties.

5.      Although Defendants removed explicit references to their Criminal Records Policy from their website and online application at some point after January 30, 2017, they did not end the policy.  In April 2017, months after the merger with Post, Defendants affirmatively reviewed, ratified, and adopted Post's unlawful blanket ban as their own, and instructed their employees to enforce it.  Upon information and belief, Defendants maintained the ban long after they adopted it as their formal policy.

6.      As a direct result of the Criminal Records Policy, applicants with a criminal record were either (1) deterred from ever applying to The Properties after learning of the Policy; or (2) automatically denied an opportunity to apply to The Properties because of their criminal history.

7.      For the reasons discussed below, Defendants' Criminal Records Policy had (and if it is still maintained, continues to have) the effect of disproportionately barring African Americans and Latinos in violation of the Fair Housing Act.  Moreover, as further demonstrated below, intentional discrimination unlawfully motivated the adoption of the policy, which was intended to minimize the number of African Americans and Latinos living in The Properties.

8.      Analysis of criminal records and other data shows that the Criminal Records Policy maintained by Defendants across The Properties had a severe disparate impact on the basis of race and national origin.  African Americans who lived in each of the rental markets where The Properties are located and satisfied Defendants' income requirements for The Properties are two to twelve times as likely as whites[1] to be excluded by Defendants' prohibition against people with certain criminal records.  Latinos are two to four times as likely as whites to be excluded in many of these markets.

9.      The Fair Housing Act prohibits any policy that has a disparate impact unless it is necessary to achieve a substantial, legitimate, nondiscriminatory business purpose that cannot be satisfied with a less discriminatory alternative.

10.      Defendants' Criminal Records Policy was not necessary to achieve a substantial, legitimate, nondiscriminatory business purpose.  In April 2016, the U.S. Department of Housing and Urban Development ("HUD") issued guidance which provided that automatic bans like Defendants' have a disproportionate adverse effect on African Americans and Latinos because of disparities in the criminal justice system, and that automatic bans which categorically exclude applicants as a result of their criminal history are *never* necessary to achieve the potentially legitimate interest of protecting safety and/or property.

11.      What is more, a less discriminatory alternative for dealing with any potential concerns raised by applicants with criminal records was available to Defendants—one that is already well-established in the area of employment discrimination law and regulation, and established through the above HUD Guidance.

---

[1] "White" is used herein to refer to non-Hispanic Caucasians.

12.     Instead of automatically excluding every applicant covered by their far-reaching Criminal Records Policy, Defendants should have assessed potential residents with a criminal history individually by considering factors directly relevant to the qualifications for tenancy such as the nature of the conviction or conduct, how long ago it occurred, the age of the person at the time of the conviction, post-conviction and post-release conduct, evidence of rehabilitation, evidence of any current threat to safety or property, letters of recommendation, the individual's history as a tenant and as a whole, and other relevant factors.  When considered in their totality, such an individualized assessment would enable a landlord to make a reasoned decision about the particular individual's suitability as a resident.

13.      The more tailored approach required by an individual assessment protects public safety and property, yet it is less discriminatory and exclusionary because it reduces the number of African Americans and Latinos categorically barred from housing at The Properties.

14.     ERC brings this action to address Defendants' discriminatory and unlawful conduct at The Properties and to redress the harm it has suffered and will continue to suffer as a direct result of that conduct absent relief.

## PARTIES

15.     Plaintiff Equal Rights Center is a national fair housing advocacy organization and non-profit corporation headquartered in Washington, D.C.  ERC provides a multidisciplinary program dedicated to furthering the advancement of, *inter alia*, fair housing throughout the United States.  Pursuant to its mission, ERC identifies and seeks to eliminate unlawful and unfair discrimination in a variety of areas, including housing, on behalf of individuals in D.C. and throughout the nation.  To advance its mission, ERC engages in education and outreach nationwide; provides counseling to individuals facing discrimination; works with local and

federal officials to enhance fair housing laws and their enforcement; undertakes investigations to uncover unlawful discrimination; and, when necessary, initiates enforcement actions.

16.     Defendant Mid-America Apartment Communities, Inc. is a Tennessee corporation and real estate investment trust.  It is publicly traded on the New York Stock Exchange and included in the S&P 500.  It is the sole general partner of Defendant Mid-America Apartments, L.P., of which it owns 96.4%.

17.     Defendant Mid-America Apartments, L.P. is a Tennessee limited partnership and subsidiary of Defendant Mid-America Apartment Communities, Inc.

18.     Defendants Mid-America Apartment Communities, Inc. and Mid-America Apartments, L.P. state in filings with the U.S. Securities and Exchange Commission ("SEC") that they are operated "as one business."  MAA's assets exceed $11 billion.  It owns and operates 302 apartment communities with over 99,000 apartment units, including Post Massachusetts Avenue in Washington, D.C.  MAA's net income for the first half of 2017 exceeded $93 million.

19.     Defendant MAA acquired Post Properties, Inc. and Post Apartment Homes, L.P. (collectively, "Post") on December 1, 2016, for approximately $4 billion.  On that date Post Properties, Inc. was merged with and into Defendant Mid-America Apartment Communities, Inc., and Post Apartment Homes, L.P. was merged with and into Defendant Mid-America Apartments, L.P.  The separate corporate existence of the two Post companies, which had also operated "as one business" as stated in SEC filings, ended and Post became part of MAA.  Post's liabilities for the legal violations addressed in this Complaint became MAA's liabilities.  Three Post directors became directors of MAA.

20.     Post owned and operated at least 55 apartment communities with approximately 20,000 apartment units, including Post Massachusetts Avenue in Washington, D.C.  The

apartment communities at issue in this Complaint were among those owned and operated by Post. MAA became the owner and operator of Post's apartment buildings, including all of The Properties, upon MAA's acquisition of Post.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

22. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants are residents of the district and one of Defendants' apartments buildings is located in the district, with several others in close proximity, and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

### I. THE PROPERTIES AND THE CRIMINAL RECORDS POLICY ENFORCED AT THE PROPERTIES

#### A. The Properties

23. The Properties are 55 apartment complexes across the country containing over 20,000 units. Defendants own and operate The Properties, and Defendants have applied their Criminal Records Policy at all of them. The Properties are listed in Exhibit A and are located in the District of Columbia, Florida, Georgia, Maryland, North Carolina, Texas, and Virginia.

24. Units offered for rent in The Properties are predominantly studios, and one- and two-bedroom apartments. These units are offered at a range of price points, depending on location. The geographic distribution of The Properties, and minimum rents based on publicly available information on Defendants' website, are as follows:

a.  One apartment community in Washington, D.C. and two others in the nearby Maryland suburbs of Rockville and Hyattsville.  Minimum rent ranges from $1,100 to $2,150 per month in these communities.

b.  Four apartment communities in Northern Virginia (Alexandria, Arlington, Centreville, and McLean). Minimum rent ranges from $1,300 to $1,525 per month in these communities.

c.  Five apartment communities in Charlotte.  Minimum rent ranges from $775 to $1,090 per month in these communities.

d.  One apartment community in Raleigh.  The minimum rent is $875.

e.  Fifteen apartment communities in the Dallas/Ft. Worth area.  Minimum rent ranges from $865 to $2,205 per month in these communities.

f.  Four apartment communities in Austin.  Minimum rent ranges from $1,060 to $1,460 per month in these communities.

g.  Three apartment communities in Houston.  Minimum rent ranges from $830 to $1,140 per month in these communities.

h.  Five apartment communities in Tampa.  Minimum rent ranges from $975 to $1,320 per month in these communities.

i.  Three apartment communities in the Orlando area.  Minimum rent ranges from $1,020 to $1,255 per month in these communities.

j.  Twelve apartment communities in the Atlanta area.  Minimum rent ranges from $945 to $1,575 per month in these communities.

25.     Amenities offered at The Properties vary.  Some include pools, gyms, concierge services, and outside recreational space.  Defendants present their properties as upscale and of high quality.

**B.     Defendants' Policy Prevented Applicants with Criminal Records from Applying**

26.     In 2016, as part of its mission to identify and eliminate unlawful and unfair discrimination in housing and to increase access to fair and affordable housing, ERC conducted a series of tests to assess the types and severity of the barriers individuals with criminal histories face when seeking housing in Washington, D.C.  In the course of those tests, ERC encountered the policies and practices of Post Massachusetts Avenue, a property of Defendants located in Washington, D.C. Post Massachusetts Avenue's stated policy regarding criminal records—an automatic ban targeting not only convictions but also criminal charges as applied to all felonies and a substantial number of misdemeanor convictions and charges—was so exclusionary and broad in its impact that ERC launched a deeper investigation into Post's practices nationwide.

27.     From November 2016 through early 2017, ERC conducted an investigation into the Criminal Records Policy maintained at The Properties.  Specifically, Defendants' website revealed that, at each of The Properties, Post expressly stated that individuals with felony convictions and certain unspecified misdemeanor convictions, or pending charges of either level of offense, would not be accepted as tenants and precluded individuals with felony convictions from even submitting an application.

28.     The investigation showed that Post maintained the website www.postproperties.com.  This website was the first hit that appeared after prospective tenants searched for "Post Properties" using the Google search engine.  On the home page for

www.postproperties.com, a bar appeared across the top of the page and included different headings, such as "Communities," "Why Post," and "About Us."

29.     When the ERC investigator hovered the computer cursor over the "About Us" heading, a box appeared with several subheadings on which the investigator could click.  One subheading was "FAQ" with the text "Get answers to frequently asked questions about living at a Post community."  When the investigator clicked on this subheading, it brought the investigator to another page entitled "Post Properties FAQs," which was located at http://www.postproperties.com/faq-full#002005.  Underneath was the following text: "Finding the right apartment home can be exciting—and a little overwhelming!  At Post, we want to make the process as easy as possible so we have assembled answers to some Post Properties FAQs…"

30.     The rest of the page had several sections organized by the types of questions raised, including one section entitled "Questions Regarding the Post Application Process."  In this section, there were questions such as "How do I know if the apartment I want is available?" and "How does Post determine whether or not they accept my application?"  The ERC investigator clicked on this latter question and was directed to the answer farther down on the page.  The answer stated as follows: "Post's Resident Selection Criteria includes: (1) criminal history, (2) previous rental history, (3) current income, (4) credit history, and (5) employment verification. This information is verified by a third-party screening company."

31.     Immediately after this statement, the ERC investigator encountered an italicized heading for "Criminal History" and then the following statement: "**Any felony conviction or pending felony charge as well as certain misdemeanors or pending misdemeanor charges will result in denial of an Application for Residency.**"  This language evidences a clear refusal to rent to people with a broad array of conviction and arrest histories.

32.     Individuals visiting the website www.postproperties.com who were interested in renting an apartment could search and apply for available apartments directly from the website. The ERC investigator found that Post repeated its Felony Ban in the online application available on the website.

33.     The home page included a section entitled "Search for an Apartment," where prospective tenants were prompted to select a specific apartment community from a drop-down menu, the type of unit, and the available date on which they desired to move.  When the ERC investigator did this, the website generated a list of units that matched the selected search criteria.  The investigator could also click on individual units to get more information, which led to a screen that included a picture of the individual unit's floorplan, pricing options for different lease terms, and also a "Lease Now" button.  Clicking this button led to a separate portal entitled "Post Open Door."

34.     Throughout "Post Open Door," the pages appeared with a vertical panel on the left-hand side of the screen.  The panel included tabs numbered 1 through 8 and labeled as follows: (1) Rental Options; (2) Qualifying Criteria; (3) Applicant Info; (4) Additional Applicants; (5) Rentable Items; (6) Application Charges; (7) Lease Summary; and (8) Lease Documents.

35.     The first page of the "Post Open Door" portal showed basic details about the particular unit of interest, and on the left-hand panel, the first tab entitled "Rental Options" was highlighted.  Underneath the unit details was a "Start Application" button, which led to another page that said "Apply Online Now" and "Get the apartment you want right away!"  This page required the user to create a personal account to proceed: it included blanks for a name, email address, password, and phone number, followed by a "Create My Account" button.

36.     After creating a personal account, the investigator saw a page describing various policies at The Properties regarding occupancy limits, income requirements, pets, and vehicles. The second tab entitled "Qualifying Criteria" was highlighted on the left-hand panel.  At the bottom of the page there was a checkbox next to the statement "I accept the Qualifying Criteria." The investigator could move to the next page only after checking this box.

37.     On the following page, the only text that appeared was this question: "Have you or any other applicant or occupant ever been convicted of a felony?"  Below the question was a drop-down menu with "yes" or "no" as options.  Immediately after the text of the question, there was a circular icon indicating additional information, and when the ERC investigator hovered the computer cursor over this icon, a text box appeared with the following statement: "We are unable to lease to anyone who has been convicted of a felony.  Should you have any questions, please contact the leasing office for this community."

38.     The following screenshot from the website shows what the investigator saw for the Post Massachusetts Avenue property (a full page version of the image is attached as Exhibit B):



39.     When ERC's investigator selected "yes" from the drop-down menu and clicked to continue, a box popped up on the screen.  The box contained this statement: "We are unable to reserve an apartment for you at this time due to your answer regarding Felony convictions. Should you have any questions, please contact the leasing office for this community."  When the investigator tried to proceed to the next step of the application by clicking the "Save & Continue" button, the same box popped up and the application process would not proceed.  In this way, the investigator found that the online application worked not only to deter prospective tenants with felony convictions from applying to The Properties, but actually to block further efforts to apply.

40.    The following screenshot shows what the investigator saw (a full page version of the image is attached as Exhibit C):



41.    Alternatively, when the ERC investigator selected "no" from the drop-down menu and clicked to continue, a new page appeared where the third tab entitled "Applicant Info" was highlighted on the left-hand panel.  The top of the page said "Getting Started" and described the subsequent steps for completing the online application as well as the information needed to do so.  The ERC investigator scrolled down the page and was prompted to provide, *inter alia*, personal contact information, a current address, current and past employment, and vehicle information.  Upon entering this information the investigator could proceed with the rest of the application.  One of the additional steps, under the heading "Screening Information," required the investigator to authorize Post to obtain a criminal history report.

42.    Plaintiff's investigation confirmed that the same Criminal Records Policy applied at each of The Properties. Specifically, Plaintiff expended dozens of hours creating applicant

profiles, submitting applicant information, and documenting the process of applying to each one of The Properties.

43.     After Post was merged into MAA in December 2016, Plaintiff continued its investigation into the Criminal Records Policy implemented at The Properties. Through testing conducted in January 2017, Plaintiff found that MAA integrated much of Post's website into its own, including the elements described above.  In the same way as before the merger, the online application could not be completed by an individual with a history of a felony conviction.  The website and online application likewise set forth the policy automatically prohibiting applicants from renting apartments at The Properties based on pending felony charges, certain misdemeanor convictions, and certain pending misdemeanor charges.

44.     At some point after January 30, 2017, MAA removed information about its Criminal Records Policy from its website.  MAA continued, however, to enforce the policy by other means.

45.     On April 3, 2017, four months after the merger with Post, Defendants reviewed, revised, and affirmatively adopted a document titled "Accepting and Approving a Rental Application," (hereinafter, "Rental Guidance") that had been previously issued by Post in March 2016.  The document articulated applicant admissions criteria for the Subject Properties, including that any applicant with a past felony conviction was to be automatically rejected.

46.     The Rental Guidance expressly applied to "Post-Branded Properties Only" and was distributed by MAA to its employees working at those properties.

47.     As part of the adopted policy, Defendants also uniformly and automatically barred applicants with pending felony charges or deferred adjudications.

48.     Similarly, applicants with convictions or pending cases for certain misdemeanors were also permanently banned.

49.     The Rental Guidance confirms that even though Defendants removed reference to their Criminal Records Policy from their website, they still agreed with the underlying policy and instructed their employees to implement it.

50.     Given that Defendants intentionally ratified and adopted this guidance on accepting and approving rental applications several months after acquiring Post, upon information and belief, Defendants maintained their Criminal Records Policy or a substantially similar policy for an extended period after its official adoption.

## II.     DEFENDANTS' CRIMINAL RECORDS POLICY CONSTITUTES UNLAWFUL DISCRIMINATION ON THE BASIS OF DISPARATE IMPACT

51.     Facially neutral housing practices that have a disparate impact on the basis of race or national origin are prohibited by the Fair Housing Act unless they are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice.  Policies that automatically deny housing to people with criminal records, including the Criminal Records Policy maintained and enforced by Defendants at The Properties, are unlawful under this standard.

52.     As detailed below, automatic bans based on felony convictions or other criminal history bans have a severe disparate impact on African Americans and Latinos.  Because of racial disparities among people with criminal records, Defendants' Criminal Records Policy operated to disqualify otherwise-qualified African Americans and Latinos from living at The Properties at a rate, depending on the specific property at issue, up to twelve times the rate at which otherwise-qualified whites were disqualified.

53.     Even where a housing provider implements "a more tailored policy or practice that excludes individuals with only certain types of convictions," the provider "must still prove that its policy is necessary to serve a 'substantial, legitimate, nondiscriminatory interest.'" *See* Exhibit D (HUD, *Office of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records by Providers of Hous. and Real Estate-Related Transactions*) (Apr. 4, 2016) ("HUD Guidance") at 6. A policy categorically banning all  "felonies" without distinction runs counter to HUD's directive and does not begin to satisfy Defendants' burden of proof, as such a policy does not even attempt to "accurately distinguish[] between criminal conduct that indicates a demonstrable risk to resident safety and/or property and criminal conduct that does not," as is required. *Id*.

54.     Any legitimate concerns, including those with respect to protecting safety and property, can be satisfied through the less discriminatory alternative of giving individualized consideration to each potential resident's circumstances and desirability as a tenant.  Protecting safety and property is not a valid reason for an automatic ban, but is offered as an excuse by some property owners to justify an unlawful and discriminatory policy.

**A.     Automatic Bans in General Disproportionately and Severely Impact African Americans and Latinos at the National, State, and City Levels**

55.     More than 640,000 inmates are released from confinement each year and become new targets of automatic criminal history bans.[2]  They are disproportionately African-American

---

[2] E. Ann Carson and Elizabeth Anderson, U.S. Dept. of Justice, *Prisoners in 2015*, BJS Bulletin, 10 (Dec. 2016), https://www.bjs.gov/content/pub/pdf/p15.pdf ("*Prisoners in 2015*").

and Latino because the inmate population as a whole is disproportionately African-American and Latino, and 95% of inmates are eventually released.[3]

56.    The sheer number of people released from prison every year has skyrocketed largely because the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today.  Approximately 10 million misdemeanor cases are filed every year.[4]  An additional 12 million people across the country have at least one felony conviction.[5]  At the same time, it has become much easier and more common for housing providers to identify and ban people with criminal records because of the growth of companies that provide inexpensive background checks via the Internet.

57.    The national prison population is now comprised overwhelmingly of individuals convicted of non-violent crimes. As of 2015, less than 8% of the federal prison population had been convicted of a violent crime.[6]

58.    The massive increase in incarceration and in the number of people with criminal convictions has hit African Americans and Latinos especially hard.  They are incarcerated at rates significantly disproportionate to their numbers in the United States general population.

---

[3] Devah Pager, *The Mark of a Criminal Record*, 108.5 Am. J. of Sociology 937, 957-960 (2003).

[4] Alexandra Natapoff, *Misdemeanors*, 85 S. CAL. L. REV. 1313, 1314-1315 (2012).

[5] *See* supra note 3 at 938.

[6] Carson and Anderson, *supra* note 2 at 5.

Together, African Americans and Latinos comprise approximately 56% of all prisoners.[7]

However, they only make up 32% of the U.S. population.[8]

59.     The fact that African Americans and Latinos are far more likely than whites to

have a criminal record means both that African Americans and Latinos are much more likely

than whites to be barred from housing by automatic exclusions of people with criminal records

and that the absolute number of African Americans and Latinos excluded is very large.

60.     The Equal Employment Opportunity Commission's ("EEOC") analysis of the

impact of automatic criminal history bans in the employment context further confirms the

disparate impact described here.  The EEOC has concluded from analyzing national criminal

records data that automatic criminal history bans have a disparate impact on the basis of race,

and sets forth such a presumption in its Enforcement Guidance on the Consideration of Arrest

and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of

1964 ("Enforcement Guidance"), 2012 WL 1499883 (Apr. 25, 2012).[9]

61.     The EEOC's conclusion applies to the disparate impact analysis here because

categorical criminal record policies and felony bans operate the same way in housing as they do

in employment.  In both contexts, applicants are uniformly and permanently excluded, whether

from housing opportunities or employment, before due consideration of the merits or

qualifications of the applicant for the job or housing in question are considered and without any

individualized assessment of whether their criminal history makes them personally unqualified.

---

[7] *See generally* Nat'l Ass'n for the Advancement of Colored People, *Criminal Justice Fact Sheet* (2016), http://www.naacp.org/criminal-justice-fact-sheet/.

[8] *See* U.S. Census Bureau, *Quickfacts: Race and Hispanic Origin* (2016), https://www.census.gov/quickfacts/fact/table/US/RHI325216#viewtop.

[9] The prior versions from 1987 and 1990 reached the same conclusion and set forth the same presumption.

They are excluded based solely on the fact of a prior conviction or even a pending criminal charge, regardless of whether they pose a current risk.  Indeed, HUD itself used EEOC guidance and Title VII case law as support for the conclusions reached in its April 2016 Criminal Records Guidance.  *See* Exhibit D (HUD Guidance) at 6-7, 9.

> **B.     Defendants' Criminal Records Policy Disproportionately and Severely Impacted African Americans and Latinos in the Rental Markets Where Defendants Operate**

62.     Defendants' automatic criminal history ban at The Properties had a disparate impact on the basis of race and national origin, and continues to do so to the extent that Defendants continue to maintain and enforce the Criminal Records Policy.  In fact, because disparities in incarceration rates are more severe at the city level than at the national level, including those cities where The Properties are located, the disparate impact in the urban rental markets in which The Properties are located is starker than national statistics alone suggest.

63.     Upon information and belief, the rental market for each of The Properties is the immediately surrounding metropolitan area and includes all income-qualified renters in that area.

64.     The Properties maintain minimum income thresholds for applicants, requiring prospective tenants to earn at least three times the unit's rent.  Given the monthly rent ranges identified in Paragraph 24, this means that applicants must earn a minimum of approximately $40,000 to $70,000 per year, depending on the property, to be income-qualified.

65.     Even taking this income requirement into account, Defendants' Criminal Records Policy disproportionately excluded otherwise-qualified minority applicants.

66.     At the national level, African Americans earning at least $40,000 annually are 3.81 times more likely to have a criminal record than whites earning at least $40,000 annually.

Similarly, at this income level, Latinos are 2.69 times more likely than whites to have a criminal record.

67.     With regard to African Americans and whites, the disparities only become greater as the income level increases.  At annual minimum income levels of $50,000, $60,000, and $70,000 per year, African Americans are 4.83, 9.78, and 12.61 times more likely than whites to have a past criminal conviction, respectively.

68.     While less stark, criminal conviction disparities between Latinos and whites also persist as income increases. At minimums of $50,000 and $60,000, Latinos are 2.37 and 4.13 times likelier than whites to have a past criminal conviction, respectively.[10]

69.     Just as at the national level, African Americans in the locations where The Properties are located are much more likely than whites to have a criminal record.  For example, African Americans are ten times as likely as whites to have a criminal record in Washington, D.C.; 5.08 times as likely in Tampa, Florida; 12.55 times as likely in Dekalb County, Georgia; 4.64 times as likely in Raleigh, North Carolina; 6.77 times as likely in Collin County, Texas; and 9.96 times as likely in Arlington County, Virginia.  The same is true for Latinos.  For example, Latinos are 5.69 times as likely as whites to have a criminal record in Charlotte, North Carolina; 2.51 times as likely in Fort Bend County, Texas; and 2.55 times as likely in Alexandria, Virginia. This pattern persists throughout the relevant jurisdictions.

70.     Available data on the disparities in incarceration additionally show that rates of disproportionality in incarceration change very little when a minimum income requirement of $40,000, $50,000, and $60,000 is added.   Racial disparities in criminal conviction rates in the

---

[10] Although reliable data is not available at the $70,000 minimum income level, there is no reason to believe that the disparity at that level decreases.

local markets where The Properties are located persist to approximately the same degree or greater as income levels rise.

71.     The disparities identified herein persist across categories of crime, such as felonies and misdemeanors, as well as across offense types, including drug possession, and with respect to both convictions and charges.

72.     African Americans and Latinos who are income-qualified to rent at The Properties are thus substantially more likely than whites to have been harmed by Defendants' policy against renting to people with criminal records.

73.     Other "Qualifying Criteria" listed online, such as the pet and vehicle policy, do not affect demographic analyses of the rental markets for The Properties. Each of the rental markets served by The Properties include substantial populations of African-American and Latino renters who are income-qualified to become tenants at The Properties but are nevertheless *per se* ineligible for tenancy because of the Criminal Records Policy.

74.     Defendants' refusal to provide housing to people on the basis of their Criminal Records Policy had a racially disparate, adverse impact on African Americans and Latinos. That impact continues to the extent the policy remains in force.

**C.      Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Any Legitimate, Non-Discriminatory Concern**

75.     Defendants' Criminal Records Policy was not necessary to achieve a legitimate, nondiscriminatory business purpose, and other less discriminatory alternatives exist.

76.     Giving individualized consideration to each potential resident's circumstances is a less discriminatory alternative to Defendants' Criminal Records Policy and would serve any legitimate, nondiscriminatory justification for the policy.

77.     Specifically, to the extent that public safety or protection of property at The Properties is a legitimate, nondiscriminatory justification, protection of safety and property can be accomplished through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors.  An individualized assessment allows people who have a criminal record, but who pose no realistic current or future threat to the community, to obtain housing.  This more targeted and narrower approach both protects public safety and property and is less discriminatory and exclusionary because it reduces the number of minority applicants who are banned from The Properties.

78.     The HUD Guidance expressly calls for the use of individualized consideration as a less discriminatory alternative to automatic exclusion on the basis of criminal history, through consideration of factors such as the "nature, severity, and recency of criminal conduct" and "evidence of rehabilitation."  Exhibit D (HUD Guidance) at 7.

79.     In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory alternative to automatic criminal history bans and are sufficient to protect legitimate interests like safety.

80.     The EEOC's Enforcement Guidance advocates the use of  "a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job," "notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information

provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity."[11]

81.     It would not have compromised any legitimate concern Defendants may have to give individualized consideration to applicants' particular circumstances and allow those whose tenancy would not threaten public safety or property interests to live at The Properties. Defendants' Criminal Records Policy nonetheless prevented any individualized consideration. Defendants' policy of automatically excluding people with felony convictions, certain misdemeanor convictions, and even some arrests, was not necessary to achieve a legitimate business purpose.

## III.   DEFENDANTS' CRIMINAL RECORDS POLICY IS EVIDENCE OF INTENTIONAL DISCRIMINATION BECAUSE IT AIMS TO REDUCE THE NUMBER OF AFRICAN AMERICANS AND LATINOS LIVING AT THEIR PROPERTIES

82.     Several factors strongly indicate that the real reason Defendants adopted the Criminal Records Policy was not to protect safety or property, or for any other legitimate reason, but to diminish the number of African Americans and Latinos who become tenants.  Any such purported justification is really pretext for intentional discrimination.

83.      Intentional discrimination may be inferred from a number of factors, including whether the challenged action weighs more heavily on one group than another, whether there have been changes in normal procedures, and whether there have been substantive departures from usual practices.  *Vill. of Arlington Heights v. Metro. Dev. Corp.*, 429 U.S. 252 (1977).

84.     The statistical disparities here are extraordinary.  That is, the difference in the rates at which prospective African American and Latino tenants were adversely affected by the

---

[11] Enforcement Guidance at 14.

policy is dramatically larger than the rate at which prospective white tenants were affected. This is not a situation where a facially neutral policy harms minorities 10% or 20% more frequently than it harms non-minorities. Rather, as shown above, otherwise-qualified African Americans were two to twelve times as likely to be barred from The Properties because of Defendants' Criminal Records Policy, and otherwise-qualified Latinos were commonly two to four times as likely. Moreover, these dramatic disparities were entirely foreseeable because of well-known disparities in the criminal justice system. As the Supreme Court has explained, large statistical disparities are "often a telltale sign of purposeful discrimination…" *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977).

85.     The HUD Guidance was released more than 18 months ago, in April of 2016, and has been well-publicized. Upon information and belief, Defendants have been well aware of it since its release. The Guidance is not ambiguous; it clearly explains how broad-based criminal background policies that rely on criminal histories cause a disparate impact on minorities, how automatic blanket bans that categorically exclude applicants as a result of their criminal history are not necessary to satisfy a legitimate business purpose, and that giving individualized consideration to applicants based on factors such as the nature of a conviction and evidence of rehabilitation is a less discriminatory alternative that satisfies legitimate interests in protecting safety and property.

86.     Accordingly, on information and belief, Defendants were aware of the disparate and discriminatory impact that their Criminal Records Policy would have on African Americans and Latinos, and they were aware of a less-discriminatory approach to screening potential tenants — individual assessment of the potential tenant's criminal history, based on the factors identified above — that not only would protect their safety and property interests but also complied with

HUD's explicit Guidance.  However, despite this knowledge and awareness, Defendants maintained exactly the type of policy that the HUD Guidance rejects.  Defendants deliberately chose to implement the more discriminatory method for criminal record screening that would automatically exclude a greater number of African American and Latino tenants.  One can infer from this that the disparate outcome identified by HUD was exactly the outcome intended by Defendants.

87.     Defendants' decision, months after acquiring Post, to review, ratify, and continue the overly broad and discriminatory Criminal Records Policy also reflects substantive departures from usual industry practices, which further raises an inference of discriminatory intent.

88.     Defendants' refusal until sometime earlier this year to allow people with felony convictions to even submit an application is entirely counter to normal business practices in the apartment industry.  In the normal course of business, landlords and property managers are highly motivated to get people in the door to see their buildings.  Even if someone who visits does not become a tenant, word of mouth is an important component of apartment marketing as visitors may tell others about the building.  Defendants' policy instead assured that a group of people — disproportionately minority — would have no reason to visit The Properties. Departures like this from industry norms suggest an illicit motive.

89.     Defendants' elevation of a felony conviction as an absolute bar to residency without consideration of other eligibility criteria for tenancy is also counter to normal business practices in the apartment industry.  In the normal course of business, consideration of income, prior rental history, credit, and other factors occurs simultaneously during the application process, and after an application has been submitted.

90.     Defendants' refusal to afford individualized consideration is contrary to the

practices recommended by major industry organizations including the National Multifamily

Housing Council, the National Apartment Association, and National Association of Realtors.

These major industry organizations, among others, all disseminated information about the HUD

Guidance and emphasized the importance of dispensing with automatic criminal history bans.[12]

It is very unusual for a large apartment company to so thoroughly disregard sound and well-

known industry practices designed to prevent discrimination.

91.     In light of these facts, there is no non-discriminatory explanation for why

Defendants deliberately chose to implement the Criminal Records Policy over an individualized

screening policy.  Rather, these facts collectively support the inference — indeed, they strongly

suggest — that Defendants fully understood the unnecessary and unlawful disparate impact of

their Criminal Records Policy on African-American and Latino applicants, and that they created

their policy precisely because of its discriminatory impact.  The Criminal Records Policy is a

tool that Defendants intentionally used to minimize the number of African Americans and

Latinos residing in their buildings in violation of the Fair Housing Act.

---

[12] Nat'l Multifamily Hous. Council, *Criminal Conviction Screening Policies* (June 23, 2016),
http://www.nmhc.org/uploadedFiles/News/NMHC_News/Criminal%20Conviction
%20Screening%20Policies%20_NMHC_NAA_062316%20webinar.pdf; Nat'l Apartment Ass'n,
*Fed Officials Warn Against Blanket Criminal History Exclusions* (April 25, 2016),
https://www.naahq.org/news-publications/fed-officials-warn-against-blanket-criminal-history-
exclusions; Nat'l Ass'n of Realtors, *What the Latest Fair Housing Guidance on Criminal
Background Checks Means for Real Estate* (May 13, 2016),
https://www.nar.realtor/newsroom/what-the-latest-fair-housing-guidance-on-criminal-
background-checks-means-for-real-estate.

IV.   **DEFENDANTS' CRIMINAL RECORDS POLICY PREVENTED FORMERLY INCARCERATED INDIVIDUALS FROM OBTAINING CRITICALLY IMPORTANT SAFE AND STABLE HOUSING**

92.      The harm inflicted by discriminatory automatic criminal history bans is great not only in terms of the sheer number of people affected, as shown above, but also in terms of the consequences for individuals trying to reenter society, their families, and the health of our communities.

93.      Individuals reentering society after time in prison confront an array of challenges in achieving social and economic stability.  These include finding employment, securing government benefits, and reestablishing community ties.  But their most immediate need is to secure safe and affordable housing.

94.      Research shows that success in finding adequate housing, though difficult, is critically important to meeting the other challenges faced by reentrants.  Housing has been characterized, properly, as the "lynchpin that holds the reintegration process together."[13]  Or as another expert put it, "[t]he search for permanent, sustainable housing portends success or failure for the entire reintegration process."[14]

95.      Other research has shown that reentrants who do not find stable housing in the community are more likely to recidivate than those who are able to secure permanent housing. Recidivism additionally impacts the whole surrounding community.

---

[13] Jeremy Travis, *But They All Come Back: Facing Challenges of Prisoner Reentry* 219 (2005).

[14] Barbara H. Zaitzow, *We've Come a Long Way, Baby…Or Have We? Challenges and Opportunities for Incarcerated Women to Overcome Reentry Barriers* 233 (in *Global Perspectives on Re-Entry* (2011)).

96.     An Urban Institute study likewise found a causal connection between the inability to find permanent housing and recidivism.  According to the study, reentrants often did not succeed in the community if they could not find a safe and stable place to live.[15]

97.     This and other evidence makes plain that safe and permanent housing is crucial to success in the reintegration process.  Yet automatic criminal history bans directly prevent reentrants from obtaining such housing.  By design, these policies do so thoughtlessly, without giving any consideration to the particular circumstances of a person trying to find a place to live. This complete disregard for individual circumstances cannot be justified under the law, and needlessly inflicts great harm on the formerly incarcerated, their communities, and organizations like Plaintiff that are committed to preserving access to equal housing opportunities.

## INJURY TO PLAINTIFF

98.     As a result of Defendants' actions described above, ERC has been directly and substantially injured.  Plaintiff has been frustrated in its mission to eradicate discrimination in housing and in carrying out the programs and services it provides, including encouraging integrated living patterns, eliminating unlawful barriers in housing, educating the public about fair housing rights and requirements, educating and working with industry groups on fair housing compliance, and providing assistance to individuals and families looking for housing or affected by discriminatory housing practices.

99.     After becoming increasingly aware of the effects of broad and punitive criminal record screening policies, including the exclusion of applicants with criminal records without individualized consideration, as well as the disparate impact such policies have on minority

---

[15] Jeremy Travis and Caterina G. Roman, Urban Inst., *Taking Stock: Housing, Homelessness, and Prisoner Reentry* 7-10 (2004), http://www.urban.org/publications/411096.html.

applicants, ERC invested considerable time and effort in education about the importance of

accessible housing for people with criminal records.  In the wake of its discovery of Defendants'

policy, ERC directed much of its education and counseling efforts to rebutting the impression

that automatic criminal history bans like Defendants' are permissible.

100.    Because Defendants' Criminal Records Policy has had the effect of discouraging

people with criminal records, who are predominantly minorities, from applying for housing,

Defendants' conduct frustrated Plaintiff's mission of ensuring equal housing opportunity for all

individuals, free of arbitrary barriers.

101.    Plaintiff has been damaged by having to divert scarce resources that could have

been used to provide the aforementioned services, *supra* at ¶ 92, to instead identify, investigate,

and counteract Defendants' discriminatory conduct.

102.    Specifically, Plaintiff's staff expended over 50 hours investigating Defendants'

unlawful policy and practices by examining Defendants' website and interfacing with online

applications for each of the 55 properties.  Plaintiff's staff also documented each application

attempt.

103.    In addition, Plaintiff has diverted time and money to education and outreach

efforts directly and specifically aimed at countering Defendants' discrimination.  After

encountering Defendants' blatantly discriminatory practices in late 2016, Plaintiff developed

community education programs to counteract them.  For example, Plaintiff (a) added content to

its educational presentations about discriminatory criminal records screening policies, using

Defendants' policy as an example; (b) developed and recently launched an online learning course

titled "Best Practices for Ensuring that Criminal Records Screening Policies & Practices Comply

with Fair Housing Requirements," which targets housing providers to ensure they avoid unlawful

and unnecessary automatic criminal history bans; (c) added new content to its Fair Housing

Toolkit designed to help people with criminal records understand their rights; and (d) engaged in

community and housing industry events to help educate individuals with criminal records and

service providers who have faced automatic criminal history bans in the housing market.

104.    Plaintiff engaged in each of the aforementioned activities in specific response to

Defendants' practices because they were significantly more egregious and exclusionary than the

practices of other housing providers.  These activities have caused Plaintiff's staff, from the

Executive Director on down, to expend more than 400 hours of time that, but for the need to

address Defendants' practices, would have been spent on other objectives.

105.    Plaintiff has also expended funds on these efforts that would have been otherwise

allocated.  Notably, Plaintiff specifically opted not to develop two online courses on accessibility

or update its general fair housing course in order to devote funds to the "Best Practices for

Ensuring that Criminal Records Screening Policies & Practices Comply with Fair Housing

Requirements" course developed in response to Defendants' conduct.

106.    Until redressed and permanently ceased, Defendants' unlawful, discriminatory

actions will continue to injure Plaintiff, by *inter alia*:

> a.      interfering with efforts and programs intended to bring about equality of
>
> opportunity in housing;
>
> b.      requiring the commitment of scarce resources, including substantial staff
>
> time and funding, to investigate and counteract Defendants' discriminatory
>
> conduct, thus diverting those resources from Plaintiff's other activities and
>
> services, such as education, outreach, and counseling; and

    c.      frustrating Plaintiff's mission and purpose of promoting the equal

availability of housing to all persons without regard to their membership in any

protected category, including race and national origin.

107.    Defendants' discriminatory conduct, if continued, will also deprive individuals to

whom Plaintiff provides services and others living in and near The Properties of the benefit of

living in a diverse community.

## CAUSES OF ACTION

### Count I: Disparate Impact in Violation of the Fair Housing Act, 42 U.S.C. § 3604

108.    Plaintiff repeats and incorporates by reference all allegations set forth in

Paragraphs 1 through 101 above.

109.    Defendants' acts, policies, and practices have had an adverse and disproportionate

impact on African Americans and Latinos in the rental markets in which The Properties are

located as compared to similarly-situated whites.  This adverse and disproportionate impact is the

direct result of Defendants' policy of automatically refusing housing to all persons within either

component of its Criminal Records Policy—the Felony Policy (which includes the Felony Ban)

or the Misdemeanor Policy—with no consideration of their individual characteristics and

circumstances.

110.    Defendants' Criminal Records Policy was not and is not necessary to serve any

substantial, legitimate, nondiscriminatory interest, and any such interest could be satisfied by

another practice—providing individualized consideration—that would have a less discriminatory

effect.

111.    Defendants' acts, policies, and practices constitute discrimination and violate the

Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

a.      Defendants' acts, policies, and practices constitute a refusal to rent housing or negotiate for the rental of housing because of race and/or national origin, and have made housing unavailable because of race and/or national origin, in violation of 42 U.S.C. § 3604(a);

b.      Defendants' acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or national origin in violation of 42 U.S.C. § 3604(b); and

c.      Defendants' notices and statements have indicated a preference, limitation, and discrimination based on race and/or national origin in violation of 42 U.S.C. § 3604(c).  Defendants' statements in their Criminal Records Policy that excluded any person from renting an apartment at The Properties because of criminal history subject to the Felony Policy and/or Misdemeanor Policy have a discriminatory effect on African Americans and Latinos because they actually or predictably result in a disparate impact on the basis of race and national origin.

**Count II: Disparate Treatment in Violation of the Fair Housing Act, 42 U.S.C. § 3604**

112.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 101 above.

113.    Defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race and national origin.

114.    On information and belief, Defendants were aware of the disparate impact that their Criminal Records Policy would have on African Americans and Latinos.  They were also aware of HUD's April 2016 Guidance regarding criminal records-based screening policies,

including its repudiation of automatic blanket bans and its instructions to adopt less

discriminatory approaches to screening, such as individual assessment of criminal history, that

would adequately protect public safety and property concerns.

115.    However, despite this knowledge and awareness, Defendants departed from

industry practices and deliberately chose to implement the more discriminatory method for

screening on the basis of criminal history.  Under these facts, no legitimate, non-discriminatory

explanation exists for Defendants' choice in adopting and maintaining the more discriminatory

and exclusionary policy.  Defendants selected the Criminal Records Policy with the intent and

expectation that the policy would disproportionately prevent African Americans and Latinos

from obtaining housing at The Properties.

116.    Defendants' acts, policies, and practices constitute intentional discrimination and

violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in

that:

> a.  Defendants' acts and practices constitute a refusal to rent housing or negotiate for
>     the rental of housing because of race and/or national origin, and have made
>     housing unavailable because of race and/or national origin, in violation of 42
>     U.S.C. § 3604(a); and
>
> b.  Defendants' acts, as described above, provide different terms, conditions, and
>     privileges of rental housing, as well as different services and facilities in
>     connection therewith, on the basis of race and/or national origin in violation of 42
>     U.S.C. § 3604(b).

c.   Defendants' notices and statements have indicated a preference, limitation, and discrimination based on race and/or national origin in violation of 42 U.S.C. § 3604(c).

## DEMAND FOR JURY TRIAL

117.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)   Enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 3604;

(2)   Enter a permanent injunction:

   (a)   enjoining Defendants and their directors, officers, agents, and employees from publishing, implementing, and enforcing the illegal, discriminatory conduct described herein;

   (b)   directing Defendants and their directors, officers, agents, and employees to revise their Criminal Records Policy, to the extent it continues, to reduce the adverse and disproportionate effect it causes on the basis of race and national origin and make it consistent with the HUD Guidance; and

   (c)   directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)     Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendants alleged herein;

(4)     Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)     Award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2);

(6)     Award prejudgment interest to Plaintiff; and

(7)     Order such other relief as this Court deems just and equitable.


July 16, 2018                        Respectfully submitted,


/s/ John P. Relman
John P. Relman (D.C. Bar No. 405500)
Jennifer I. Klar (D.C. Bar No. 479629)
Ryan C. Downer (D.C. Bar No. 1013470)
RELMAN, DANE & COLFAX, PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036-2456
Tel: 202-728-1888
Fax: 202-728-0848
jrelman@relmanlaw.com
jklar@relmanlaw.com
rdowner@relmanlaw.com

/s/ Jonathan Smith
Jonathan Smith (D.C. Bar No. 396578)
Catherine Cone (D.C. Bar No. 1032267)
Tiffany Yang (D.C. Bar No. 230836)
Washington Lawyers' Committee
for Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036

Tel: (202) 319-1000
Fax: (202) 319-1010
jonathan_smith@washlaw.org
catherine_cone@washlaw.org
tiffany_yang@washlaw.org

*Attorneys for Plaintiff*